# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17-CR-85-JED |
| ) | |
| JOSHUA WOFFORD, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Before the Court is defendant Joshua Wofford's Motion to Suppress In-Court Identifications (Doc. 23). Mr. Wofford also submitted a thumb drive of videos (Doc. 24), which the Court has reviewed. The United States filed a response (Doc. 27), and Mr. Wofford filed a reply (Doc. 29). The Court conducted an evidentiary hearing on the motion and admitted Plaintiff's Exhibits (PX) 1 and 2 (a copy and the original of a photo lineup) and Defendant's Exhibits (DX) 1, 3, 4, 5, 6, 8, 9, and 10. The videos on the thumb-drive (Doc. 24) were identified and admitted during the hearing as DX 5 and 6. The Court also heard testimony of the following: JLG, who is 14 years old and will be referred to by initials; Heidi Argumedo; Jose Cruz-Gonzalez; Tulsa Police Department (TPD) Officer Cleon Burrell, Daniel Harris, TPD Officer Jeff Gatwood, TPD Officer Garrett Higgins, and Scott D. Gronlund, Ph.D. During the course of the hearing, the United States presented an oral motion to exclude Dr. Gronlund's testimony (Doc. 36), to which the defendant has now filed a written response (Doc. 37), and that motion will also be addressed in this order.

**I.      Suppression Proceedings**

A motion to suppress is recognized and governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the

court must state its essential findings on the record." The purpose of a suppression hearing is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the [Constitution]." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). When making a preliminary determination of the admissibility of evidence, "the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a); *see also Merritt*, 695 F.2d. at 1269-70.

II.     **Background Facts**

    A.     **The Carjacking**

On June 4, 2017, at approximately 10:39 p.m., a Toyota Sequoia pulled into a parking slot in front of a QuikTrip on North Harvard in Tulsa, Oklahoma. Daisy Ellis was driving the Sequoia, and her husband, Daniel Harris, was sitting in the front passenger seat. As they entered the parking lot, Ellis and Harris noticed a man standing with his leg propped up against the wall to the side of the QuikTrip. Ms. Ellis entered the store, while Daniel Harris remained in the front passenger seat of the vehicle.

At 10:41 p.m., Jose Cruz-Gonzalez drove his 1999 Chevy truck into the QuikTrip parking lot and parked immediately to the right of the passenger side of the Toyota Sequoia where Mr. Harris was sitting. Mr. Cruz-Gonzalez entered the QuikTrip, while his wife (Heidi Argumedo) and three children, including JLG, remained in the truck. Soon thereafter, a man walked from where he had been leaning against the outside wall of the QuikTrip, down the sidewalk in front of the store's entryway, passing in front of the Chevy truck, and around to the driver side of the truck. The man stood in between the vehicle occupied by Daniel Harris and the vehicle occupied by Mr. Cruz-Gonzalez's family. Noticing the man he had previously seen on the side of the building

approach the driver side of the family's truck, Mr. Harris spoke to him, and the man indicated that he was taking the truck and that he had a gun.

The man then opened the door of the pickup truck, pointed a gun at Ms. Argumedo, and said "get out of the car right now." At some point, the man pointed the gun at Mr. Harris. Ms. Argumedo and her children exited the truck and entered the QuikTrip, and she asked the clerk to call police. Mr. Harris also entered the store to make sure that all of Ms. Argumedo's children had exited the truck. As the carjacker drove away in the family's stolen truck, Mr. Harris and Mr. Cruz-Gonzalez saw the carjacker put his arm out of the truck and they heard a gunshot. Mr. Harris provided a description of the weapon, which has apparently not been found, and he described the man as a white man with a scar on the right side of his face, wearing black jeans, black shoes, and a white shirt. Ms. Argumedo testified that the carjacker had a scar on his face around the cheek area close to his eye.

B. **The Police Pursuit and Search**

Soon after the carjacking was reported, TPD Officer Garrett Higgins saw the stolen truck, and he began to pursue the vehicle. At one point during the pursuit, the suspect drove to a dead-end street and had to slow the stolen vehicle to turn around. As the suspect turned and passed Officer Higgins's police vehicle, the driver sides of two vehicles were "door-to-door," within five to six feet of one another, and Officer Higgins testified that he "got a good look" at the suspect as they passed. Higgins had seen the suspect before, because he had previously been involved as a backing officer on that suspect's arrest on another occasion.[1] The pursuit continued with the

---

[1] Officer Higgins did not indicate that fact on his police radio at the time. He testified that, when he was writing his report that night, he looked up the defendant's name and recalled the prior arrest.

suspect driving the wrong direction, into oncoming traffic, on Harvard, at times above the speed limit.

The suspect ultimately drove into a ditch at 3800 N. Harvard and fled on foot. The truck was quickly found, and police commenced a search of the area. Officers set up a perimeter, and K-9 officers arrived and located the defendant in a wooded area near 3800 N. Harvard, approximately two hours after they commenced the search. Officer Higgins came to the location and identified Mr. Wofford as the man he had seen driving the stolen truck during the earlier police pursuit. Higgins found a white t-shirt about 10 to 15 yards from where the stolen truck was recovered.

### C. The Show-Up Identifications

Before Mr. Wofford was located and detained by the K-9 officers, other TPD officers drove Mr. Cruz-Gonzalez, Ms. Argumedo, and their children to the search area.[2] JLG testified that they waited in the police cars for a long time and then police informed them that they "had caught the guy."[3] After Mr. Wofford was discovered by the K-9 unit, a show-up identification procedure was conducted. The family members were driven in police cars to the nearby location where Mr. Wofford was being held by police. Mr. Wofford was then then taken out of another police car, with officers holding onto Wofford by his arms, several yards in front of the police cars in which the family members were seated. Police vehicle headlights and a spotlight were shined on

---

[2] Ms. Argumedo and one of her daughters were transported in Officer Burrell's vehicle, while Mr. Cruz-Gonzalez, JLG, and the youngest child rode with another officer to the scene where the truck was recovered.

[3] In the police car occupied by Ms. Argumedo and her eldest daughter, similar language was used to describe Mr. Wofford before the show-up. Specifically, Officer Burrell testified that he informed Ms. Argumedo that "they got the guy so we're going to take a look and see if you can identify him." Ms. Argumedo testified that she remembers hearing a call to Officer Burrell in the police car that "we got him," and she asked "did they find the guy and he said yes."

4

Wofford, and an officer asked JLG "if it was him or not." JLG responded, "yes, that's him." JLG then translated for his father, and his father answer yes to the question of whether the man in the lights "was him."

According to Officer Burrell, Ms. Argumedo did not identify Mr. Wofford as the assailant during the show-up. Ms. Argumedo testified at the hearing that she initially did not identify Wofford because he was wearing different clothes than the carjacker had been wearing, but that she looked at him more and then reported that it was him, but that he was wearing different clothes. She further testified that her identification of Mr. Wofford was solidified after she spoke to her husband and son about the man wearing a bandana. She acknowledged that it is possible that she thought Wofford was the carjacker only later, as opposed to positively identifying him to Officer Burrell during the show-up.

### D. The Photo Array Identification

TPD Robbery Detective Jeff Gatwood was the detective assigned to lead the investigation into the carjacking. Following Mr. Wofford's arrest, Detective Gatwood compiled a photo lineup. (PX 1). To do so, he located the most recent photo of Mr. Wofford that was available to the TPD, with the exception of the mugshot taken following Mr. Wofford's arrest on June 4. Gatwood explained that he thought using the photograph taken following the June 4 arrest would have been problematic because Mr. Wofford had bloody marks on his face in that photo. To select other photos for the lineup, he utilized the TRACIS data system's Q-Mug program. He entered into the system Mr. Wofford's age, race, height, weight, hair and eye color and he requested 50 or 60 photos, in order to select photographs of men with similar characteristics. From those results, Detective Gatwood selected photographs of five other men to use along with Mr. Wofford's in the photo array.

5

The photo array includes six photos of white men with very short hair, and they all appear to be of a similar age to Mr. Wofford. (PX 1, 2). Mr. Wofford's photo was placed in the number 2 position, at the top middle of six photographs arranged with three photographs on each of two rows. In Mr. Wofford's array photo, the top of what appears to be an orange shirt is visible. After compiling the array, Detective Gatwood showed it to two other detectives and asked them to determine if any of the six men in the photo array stood out more than any others, and each of the detectives selected photos other than Wofford's as appearing more prominent to those detectives' eyes.

On June 6, 2017, Detective Gatwood drove to Mr. Harris's home and asked him to look at the photo array. Gatwood asked Mr. Harris to look at each photo carefully, to take his time, and to not feel like he was being pressured. At 12:33 p.m. on June 6, 2017, Mr. Harris identified the photo of Mr. Wofford as a photo of the man he saw commit the carjacking, and he circled Mr. Wofford's photo, then wrote the date and time, and signed it. (PX 1).

Before the photo array was presented to him by Detective Gatwood on June 6, another officer had gone to the Harris home and taken a witness statement on June 5. (*See* Mr. Harris's Witness Statement, DX 10). At some point during the June 5-6 timeframe, Mr. Harris and his wife searched the Internet and found a photo of Mr. Wofford on a jail website. The precise timeframe of that research was unclear from Mr. Harris's testimony. On direct examination at the hearing, Mr. Harris testified that his computer research was conducted "after" he identified Mr. Wofford from the photo array, while on cross-examination, he indicated that he found Mr. Wofford on a jail screen and "then later" picked out Wofford from a photo lineup.

### E. The Indictment and Suppression Motion

Mr. Wofford was subsequently indicted in a two count Indictment. Count One charges him of carjacking in violation of 18 U.S.C. § 2119, and Count Two charges that Mr. Wofford used and carried a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

In his motion to suppress, Mr. Wofford requests that the Court suppress the photo array identification by Mr. Harris, as well as the show-up identification made by Mr. Cruz-Gonzalez. (*See* Doc. 23). In reply briefing and at the hearing, defense counsel was critical of the entire show-up procedure that resulted in identifications by both Mr. Cruz-Gonzalez and his son, JLG.[4]

### F. Dr. Gronlund's Testimony

At the suppression hearing, Mr. Wofford presented Dr. Gronlund, a Professor of Psychology at the University of Oklahoma, as an expert in the field of "cognition, memory, and eyewitness identification." (*See* Gronlund Declaration, DX 1). Dr. Gronlund testified that, in the last 10 to 15 years, he has conducted research and has published in the area of identification and eyewitness issues, including evaluation of how lineups are conducted in the criminal justice system. He also conducts mock crime videos which are shown to freshmen students who "pretend to be eyewitnesses and make judgments about what they remember."

Dr. Gronlund has reviewed the evidence available in the case. Among other things, he has opined that "[t]here are potential problems with [Mr. Cruz-Gonzalez's] showup identification that raise questions about its validity." (DX 1 at 2). He also opines that "[t]here are also problems with the [photo array] involving Daniel Harris," including that "[t]he lineup itself might have been

---

[4] In briefing, the government indicated that it did not intend to present testimony from Mr. Cruz-Gonzalez of his show-up identification, and will not present his in-court identification. (Doc. 27 at 1).

unfair," "Wofford's photo (#2) stands out from the others . . . [h]is head is tilted, . . . [h]e also is the only person who might be wearing an orange prison uniform . . . [b]ut most importantly, Wofford is the only one with a tattoo on his face." (*See id.* at 3-4). His ultimate conclusion is that "[t]he eyewitness testimony in this case is weak and problematic." (*Id.* at 5).

III. **Analysis**

    A. **General Due Process Requirements Applicable to Eyewitness Identifications**

To succeed on a due process challenge to an eyewitness identification, the defendant must first demonstrate that the identification was "procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry v. New Hampshire,* 565 U.S. 228, 248 (2012); *see also Manson v. Brathwaite,* 432 U.S. 98, 112–16 (1977); *Neil v. Biggers,* 409 U.S. 188, 198 (1972). Courts conduct a "due process check on the admission of eyewitness identification . . . when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry,* 565 U.S. at 232. "An identification infected by improper police influence . . . is not automatically excluded." *Id.* "Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification . . .' the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.*

    B. **The Show-Up Identifications**

In this case, the hearing testimony regarding the show-up identifications established that the police utilized an unnecessarily suggestive show-up identification process that posed a significant risk of unreliable identifications. The family was brought to the area where their stolen

8

truck was recovered, they were in two police cars, and they waited for a long time, up to two hours, for a suspect to be located. They were then driven a short distance to an area where Mr. Wofford was removed from another police car, held by the arms by police officers, placed in front of the police cars in which the family members were seated, lights were shined on Wofford at some unknown distance of at least several yards, and the family members were then asked whether the one and only person being held by officers was the carjacker. All of that happened shortly after police officers informed the family members that the police had "caught the guy" or "got the guy." Those circumstances were unnecessarily suggestive.

While JLG and Mr. Cruz-Gonzalez identified Wofford as the carjacker, Ms. Argumedo – at least initially – did not identify him as the carjacker. As a result, there are not strong enough "indicia of reliability" of the identifications to "outweigh the corrupting effect of the police-arranged suggestive circumstances." *See Perry*, 565 U.S. at 232. The Court thus concludes that evidence of the identifications that resulted from the show-up should not be admitted at trial. Accordingly, the defendant's motion to suppress is **granted** as to the show-up identifications, and evidence of those out-of-court identifications during the show-up will not be admitted.[5]

C. **The Photo Array Identification**

Consistent with the Supreme Court's general pronouncements of due process standards applicable to pretrial eyewitness identifications in *Perry*, when a pretrial photo array identification is challenged, a two-pronged due process inquiry is mandated: "first, the court must determine whether the photo array was impermissibly suggestive, and if it is found to be so, then the court

---

[5] Admission of in-court identification testimony also violates due process "when, under the totality of the circumstances, it was tainted by unnecessarily suggestive pretrial identification procedures creating a 'very substantial likelihood of misidentification." *United States v. Brown*, 200 F.3d 700, 707 (10th Cir. 1999).

9

must decide whether the identifications were nevertheless reliable in view of the totality of the circumstances." *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The second prong is only analyzed if the array is found to be impermissibly suggestive. *Sanchez,* 24 F.3d at 1262.

Under the first *Simmons* prong, the Court looks at "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *Id*. The number of photos in the array is not considered a dispositive factor and is instead used as a guidepost for analyzing the other two factors. *Id*. at 1263. "The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities." *Id*. "Ultimately, [the court] must determine whether the unduly suggestive array created a 'substantial likelihood of misidentification.'" *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014).

The evidence does not indicate that the photo array was impermissibly suggestive or created a "substantial likelihood of misidentification." Detective Gatwood fully described the process by which he utilized the Q-Mug program within TRACIS to locate 50 to 60 photos of men with characteristics that match Mr. Wofford's race, age, height, weight, hair and eye color. The Court is unpersuaded by the defendant's argument that Wofford's photo is too prominently displayed because it is on the top middle of six photographs that were presented in two rows of three photographs on each row. In addition, Gatwood adequately explained his reasons for using a recent photo of Mr. Wofford, rather than the photo taken most recently after Wofford's arrest the night of the carjacking, which showed him with bloody marks on his face. The small portion of orange shirt that is showing in the array photo of Mr. Wofford does not appear to the Court to be impermissibly suggestive; it is not obvious that the orange shirt is prison or jail-issued clothing.

Mr. Wofford has a small tattoo on his face, on the right side upper cheek, near his eye, and he is the only photo subject in the array with a visible facial tattoo. (*See* PX 1). That tattoo is not especially prominent and does not itself make Mr. Wofford's photo stand out to an eyewitness as the culprit. *See Sanchez*, 24 F.3d at 1262-63 (array was not impermissibly suggestive where defendant was the only of six individuals depicted with his eyes closed); *United States v. Jones*, 652 F. Supp. 1561 (S.D.N.Y. 1986) (photo array was constitutional despite the fact that defendant was the only person whose face was pock-marked). The size of the photo array – six photos – is not per se unconstitutional and merely affects the weight given to other alleged problems in the array. *See Sanchez*, 24 F.3d at 1262. Overall, the six men pictured in the array are similar in their physical appearance.

Moreover, there is no evidence that Detective Gatwood's presentation of the photo array to Mr. Harris was conducted in a suggestive manner. Gatwood instructed Mr. Harris to take his time, look at each photo carefully, and to feel no pressure. Having determined that the photo array is not unduly suggestive, the Court need not reach the second prong.

The defendant also argues that the photo array was unreasonably suggestive because Mr. Harris and his wife may have looked at a jail photo of Mr. Wofford after the carjacking but before Detective Gatwood came to Mr. Harris's home to present the photo array. While that may present fodder for cross-examination as to Mr. Wofford's memory or identification, it does not present a due process concern that requires exclusion of Mr. Harris's identification. As the Supreme Court in *Perry* explained:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement

11

> activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Perry*, 565 U.S. at 232–33. If Mr. Harris's viewing of a photo of Mr. Wofford on the Internet occurred before the photo array, it did not involve any state action or any impermissibly suggestive action by law enforcement, and thus it does not present a due process concern that requires exclusion of Mr. Harris's identification.

The defendant's motion to suppress is thus **denied** as to Mr. Harris's identification of Mr. Wofford.

### D. Admissibility of Dr. Gronlund's Testimony

During the hearing, the United States moved to exclude Dr. Gronlund's testimony. The defendant filed a written response asserting that Gronlund's testimony satisfies the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and should be admitted at trial to assist the jury in evaluating the reliability of eyewitness identifications. Pursuant to Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert* suggested non-exhaustive factors to guide "trial courts in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (citing *Daubert*, 509 U.S. at 593-94). The inquiry is "flexible," "do not constitute a 'definitive checklist or test,'" and the district court does not need to consider every factor. *Id.* at 989–90; *see Bitler v. A.O. Smith. Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (The "list is neither definitive nor exhaustive and . . . a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability.").

The court should make a preliminary finding whether the expert is qualified, by determining "if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'" *Bitler*, 400 F.3d at 1232-33 (quoting *Daubert*, 509 U.S. at 592). The proponent of expert testimony must establish that the expert used reliable methods to reach his conclusion and that the expert's opinion is based on a relevant factual basis. *See id.* at 1233. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, advisory committee note.

As an initial matter, the Court notes that much of Dr. Gronlund's Declaration and hearing testimony were directed to the show-up identifications (*see* DX 1), which the Court has already determined will be excluded from trial. Indeed, the Court did not need Dr. Gronlund's testimony

13

to determine the legal question of whether the show-up procedure was unnecessarily suggestive or, if so, whether there were sufficiently strong indicia of reliability to outweigh the suggestiveness of the police procedure.

In an effort to meet his burden to establish that Dr. Gronlund's testimony is admissible under *Daubert* standards, the defendant submitted a transcript from a state court hearing in Cleveland County, Oklahoma, in which a judge concluded that Dr. Gronlund would be permitted to provide expert testimony regarding potential issues with eyewitness testimony. (*See* Doc. 37-1). Dr. Gronlund has never testified at any jury trial, and he has been notified by defense attorneys about five or six other times that judges in other cases would not allow his testimony. In any event, the fact that an expert has been permitted to testify in another case does not satisfy the specific question here. *See United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (although expert had been permitted to testify in the past, "'the question before the trial court [i]s specific, not general,' [and] the [trial] court ha[s] an obligation to assess the methodology that [the expert] had employed in the case at hand. . . . [The defendant] could not assume that his expert's testimony would be admitted because other courts had allowed it in; he had to carry his burden of demonstrating the admissibility of [the expert's] testimony in this particular case."). Thus, the Court must still consider the proffered testimony in relation to *this case*. *See id.*

In this Circuit, there is not a per se rule excluding expert testimony regarding the reliability of eyewitness testimony. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124 (10th Cir. 2006). Where such testimony has been permitted, it has been admitted in "narrow" circumstances, such as problems with "cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as the feedback factor and unconscious transference." *See id.* at 1124. "In short, subject to the trial court's careful

supervision, properly conceived expert testimony may be admissible to challenge or support eyewitness evidence." *Id.* "But outside these specialized circumstances, expert psychological testimony is unlikely to assist the jury-skillful cross-examination provides an equally, if not more, effective tool for testing the reliability of an eyewitness at trial. Jurors, assisted by skillful cross-examination, are quite capable of using their common-sense and faculties of observation to make this reliability determination. Nonetheless, we remain cognizant that while cross-examination is often effective, expert testimony, when directed at complex issues, may provide a more effective tool for rebutting an eyewitness's testimony." *Id.* at 1125 (internal citations omitted).

Dr. Gronlund's opinions with respect to Mr. Harris's photo array identification (and any other identifications) will not help the jury to understand the evidence or to determine a fact in issue in this case, as is required for admissibility of such testimony. *See* Fed. R. Evid. 702. While the Court is aware, in general, of "potential problems" or "potential shortcomings" (as Dr. Gronlund puts it) with eyewitness identifications (*see* DX 1 at 2, 5), Dr. Gronlund's testimony did not advance this Court's consideration of the evidence regarding Mr. Harris's identification. In the Court's view, Dr. Gronlund's opinion is devoid of the application of a reliable methodology to the evidence of this case. While he offers certain general criticisms of police procedure in the photo array, based upon very generalized descriptions of studies and his overall experience (*see* DX 1 at 3-4), that does not satisfy *Daubert*. His testimony is essentially that his opinions are based on his experience and body of knowledge of identification and memory issues. That does not present a reliable methodology or explain how any such methodology can be reliably applied to the evidence of this case. His experience conducting mock crime video experiments with students outside of real-world circumstances and his review of research into other potential problems with eyewitness identification issues is unhelpful to the specific evidence in this case. Finally, his

ultimate conclusion that "[t]he eyewitness testimony in this case is weak and problematic" (DX 1 at 5) would present a serious risk of confusing the jury and invading the jurors' province to determine witness credibility.

The motion to exclude Dr. Gronlund's testimony from trial (Doc. 36) is **granted**, and his testimony will not be admitted at trial.

**SO ORDERED** this 17th day of November, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE